AO 241    (Rev. 5/85)

**FILED**

*JUN 10 2016*

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District  EASTERN | |
|---|---|---|
| Name  SALVADOR LOPEZ | Prisoner No.  G.38482 | Case No.  CRF081476 |
| Place of Confinement  KERN VALLEY STATE PRISON P.O BOX 5103 DELANO CA 93216 | **T: 16 CV 00080 2 SKO HC** | |
| Name of Petitioner (include name under which convicted) SALVADOR LOPEZ | Name of Respondent (authorized person having custody of petitioner) V.  PEOPLE OF THE STATE OF CALIFORNIA | |
| The Attorney General of the State of: CALIFORNIA | | |

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  SUTTER COUNTY, SUPERIOR COURT

2. Date of judgment of conviction  SEPTEMBER 30, 2008

3. Length of sentence  34 YEARS TO LIFE

4. Nature of offense involved (all counts)  ATTEMPTED MURDER WITH GANG AND GUN ENHANCEMENT

5. What was your plea? (Check one)
   (a) Not guilty    ☒
   (b) Guilty    ☐
   (c) Nolo contendere    ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury    ☒
   (b) Judge only    ☐

7. Did you testify at the trial?
   Yes ☒    No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒    No ☐

**RECEIVED**

JUN 10 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

9.   If you did appeal, answer the following:

(a) Name of court _THIRD APPELLATE DISTRICT_

(b) Result _AFFIRMED_

(c) Date of result and citation, if known _FEBRUARY 8, 2015_

(d) Grounds raised[1] _ERROR IN NOT BIFURCATING GANG CHARGES (2)_

_IMPROPER ADMISSION OF PRIOR AND JURY INSTRUCTION ERROR._

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court _CALIFORNIA SUPREME COURT_

(2) Result _DENIED_

(3) Date of result and citation, if known _____

(4) Grounds raised _SAME AS # 9 A-D_

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court _____

(2) Result _____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒   No ☐

11.  If your answer to 10 was "yes," give the following information:

(a) (1) Name of court _SUPREME COURT_

(2) Nature of proceeding _PETITION FOR WRIT OF HABEAS CORPUS_

(3) Grounds raised _NEW EVIDENCE OF ACTUAL INNOCENCE_

(3)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No ☒

(5) Result _COURT ISSUED AN ORDER TO SHOW CAUSE. NO HEARING_

(6) Date of result _NOVEMBER 3, 2015, AND NOVEMBER 20, 2015_

(b) As to any second petition, application or motion give the same information:

(1) Name of court _IN THE SUPREME COURT_

(2) Name of proceeding _PETITION FOR REVIEW_

(3) Grounds raised _NEW EVIDENCE OF ACTUAL INNOCENCE_

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No ☒

(5) Result _DENIED_

(6) Date of result _5·25·2016_

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.        Yes ☒   No ☐
(2) Second petition, etc.      Yes ☒   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12.   State· *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
        CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241    (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: NEW EVIDENCE OF ACTUAL INNOCENCE

Supporting FACTS (state *briefly* without citing cases or law): SEE PAGE ATTACH

B. Ground two: PETITIONER'S CONFRONTATION RIGHT WERE VIOLATED AND WHETHER TRIAL COUNSEL OBJECTION RENDERS I.A.OC

Supporting FACTS (state *briefly* without citing cases or law): SEE PAGE ATTACH

(5)

C. Ground three: PETITIONERS RIGHT TO CONFRONT WITNESSES

WHOSE DECLARATIONS WERE RELATED IN A SHERIFFS REPORT

Supporting FACTS (state *briefly* without citing cases or law): SEE PAGE ATTACH

D. Ground four: EVIDENCE OF GANGS PATTERN OF CRIMINAL CONDUCT

WAS UNDULY PREJUDICIAL

Supporting FACTS (state *briefly* without citing cases or law): SEE PAGE ATTACH

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing NORMAN P. HANSEN, P.O BOX 352,

TUBA CITY, CA 95992

(b) At arraignment and plea NORMAN P. HANSEN, P.O. BOX 352,

YUBA CITY CA 95992

(6)

(c) At trial __NORMAN P. HANSEN. P.O BOX 352. YUBA CITY__

__CA. 95992__

(d) At sentencing __NORMAN P. HANSEN · P.O BOX 352. YUBA__

__CITY CA. 95992__

(e) On appeal __MAUREEN L. FOX 15732 LOS GATOS BLVD.__

__LOS GATOS CA 95032__

(f) In any post-conviction proceeding _____

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
   Yes ☐   No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
   Yes ☐   No ☐
   (a) If so, give name and location of court which imposed sentence to be served in the future: _____

   (b) Give date and length of the above sentence: _____

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   Yes ☐   No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_Signature of Attorney (if any)_

I declare under penalty of perjury that the foregoing is true and correct. Executed on

__5·26·16__
Date

_Signature of Petitioner_

STATEMENT OF THE EVIDENCE

On March 12, 2008, Josiah Pacheco was found bleeding in the street. (1RT 144.) A surgeon testified that Pacheco received six bullets, none of which hit any vital structures and none of which were life-threatening. (1RT 261.) Pacheco told the police that some Sureno shot him. (1RT 144, 153.) According to an officer who spoke with Pacheco in the ambulance, but who kept no notes of the conversation, Pacheco said that he had been walking on Cooper Avenue, a car came to a stop, three occupants exited and one said, "What's up?" (1RT 173-174.) One, Chava Lopez, whom he knew from juvenile hall, began shooting at him. (1RT 173-174.)

At trial, Pacheco testified that someone exited a car and shot at him and that he did not know who it was. (1RT 182-184.) He was looking at the gun, not the shooter. (1RT 199.) He did not recall telling an officer in the ambulance that petitioner was the shooter. (1RT 188.) He told his father that he thought it was petitioner who shot him, and Pacheco's father relayed that information to the police when the police were questioning Pacheco at the hospital. (1RT 186.) Pacheco had been mistaken, however: petitioner did not shoot him. (1RT 185.)

The notion that the person who shot him was petitioner was like a glimpse he had in his head, perhaps because of things that happen in life. (1RT 221.) He did not know if something made him think of petitioner for a second. (1RT 221.) But it was not petitioner who shot him. (1RT 221.)

Detective Scottie Clinkenbeard interviewed Pacheco at the hospital the day after the shooting. (2RT 298-299.) Initially, when asked if he had mentioned the previous night that he recognized the person who shot him, Pacheco responded, "I have no idea what you're saying." (1ACT 1.) Subsequently, without responding to any question, Pacheco said, "His name is Chava Lopez." (1ACT 2.) Clinkenbeard asked, "Well, why do you say he's the one who shot you?"

and Pacheco answered, "Because that's who it looked like." (1ACT 3.) Pacheco said that there were five people in the car, that they were staring at him, that the car drove by and then turned around, and that Chava got out of the passenger's side. (1ACT 5.) He said that he had been locked up with Chava a long time ago in juvenile hall. (1ACT 5-6.) He said Chava had a problem with him because he had beaten up Chava's older brother. (1ACT 6.) Shown photographs, Pacheco selected a photograph of petitioner, and said that was Chava. (1ACT 7-8, 2RT 302.) Asked if he was positive, he said that on a scale of 1 to 10, he would give a 7 or 8. (1ACT 8.)

Pacheco also said that he did not want to press charges. (1ACT 9.) He said, "I don't even know if it was him." (1ACT 10.)

After speaking with his uncle, Pacheco again told Clinkenbeard that the car drove past him; its occupants stared at him; the car turned around; Chava and some others got out; and Chava shot him. (1ACT 16.) Again on March 17, 2008, Pacheco told Clinkenbeard that Chava Lopez shot him. (2RT 304, 306, 2ACT 312.)

Pacheco testified that he cooperated with the detective by calling petitioner and asking him a couple of questions. (1RT 208.) The detective told him to say to petitioner, "You shot me," and Pacheco did say that, even though he knows that petitioner is not the person who shot him. (1RT 209.) In that phone call, petitioner told Pacheco repeatedly that the shooter was not petitioner and that Pacheco had it all twisted. (2RT 962-967.)

Pacheco told an officer, on the day of the preliminary hearing, that, if the shooter were caught, he would not say in court that that person was the shooter. (1RT 190, 2RT 335.) Clinkenbeard testified that Pacheco was upset and said that there was a mistake and the police had the wrong guy. (2RT 334.) He said that he had been shot by his own homies, that is, the Nortenos. (2RT 379-380.)

II

Yuba City Police Officer Aaron Moe, testifying as an expert in criminal street gangs, spoke of various prior bad acts by petitioner, his family members, and some others. (2RT 445-446, 479-491.) It was Moe's opinion that petitioner was an active participant in the Sureno criminal street gang on March 12, 2008, and that a hypothetical offense resembling the offense in this case would have been committed for the benefit of, in association with, or at the direction of the Sureno criminal street gang. (2RT 494-495.)

Petitioner's mother, Elvira Lopez, testified that at 3:30 p.m. on March 12, 2008, she left her four-year-old son, Jorge Luis, to be watched by petitioner while she worked. (2RT 528-530.) She worked from 3:30 p.m. until 2:00 a.m. (2RT 532.) It was her habit to call home during her breaks. (2RT 532-533.) Petitioner would answer the telephone in their house every day when she called. (2RT 534.) On March 12, Mrs. Lopez had lunch from 7:55 to 8:24 p.m., and another break at 11:00 p.m., and would have called petitioner at those times. (2RT 539.) Also, when Mrs. Lopez would come home from work, petitioner was always there. (2RT 543.)

Petitioner testified that he did not shoot Pacheco. (2RT 558.) He was at home babysitting on March 12 at around 10:00 p.m. (2RT 558.) He was babysitting on a regular basis in March. (2RT 559.)

Petitioner testified that, in 2004 or 2005, he was hanging around with Surenos and was sent to Camp Singer, a youth guidance center, after he admitted being in possession of a gun. (2RT 562, 577-578.) The gun was not his, but he was told that he could not win at trial, so he admitted the offense. (2RT 578.) Camp Singer is next to the juvenile hall located in Marysville, but the populations are kept separate. (2RT 562-563.) Petitioner remembered having seen Pacheco somewhere, perhaps at the juvenile hall. (2RT 563.)

Since he was released from Camp Singer in September of 2007, petitioner

has tried to stay out of trouble. (2RT 564-565.) He has been in trouble since getting out of the camp, but the trouble was not gang-related. (2RT 572-573.)

IV

I   PETITIONER'S STATE AND FEDERAL FOURTEENTH AMENDMENT CONSTITUTIONAL
RIGHTS TO DUE PROCESS WERE VIOLATED, BECAUSE PETITION IS ACTUALLY
INNOCENT OF COMMITTING THE CHARGED CRIME.

Petitioner contends that he was denied his State and Federal Fourteenth
Amendment rights, which were violated due to Petitioner's actual innocence
of the committed charged crime.

### A. Standard Of Review.

Reasonable minds may disagree on many issues that are raised in
the criminal justice system. However, the one principle on which everybody
would be expected to agree on is that prisons are for the guilty, and the
courts should ensure that the innocent are freed. In fact, this fundamental
idea is far and universally accepted. See Ex parte Elizondo, 947 S.W.2d 202
(Tex.Crim.App. 1996), Judge Womack's dissent. This article examines the constitutional
basis for the contention that an actually innocent person should have access
to the courts in order to challenge his conviction:

> "[A]t the threshold, we must decide whether the Due Process Clause of the
> United States Constitution forbids, not just the execution, but the incar-
> ceration as well as of an innocent person. We need not pause long to answer
> this question ... We think it clear ... that the incarceration of an innoc-
> ent person is as much a violation of the Due Process as is the execution of
> such a person. It follows that claims of actual innocence are cognizable by
> this court in a post-conviction habeas corpus proceeding whether the punish-
> ment assessed is death or confinement. In either case, such claims raise
> issues of federal constitutional magnitude." Ex parte Elizondo, 947 S.W.2d
> 202 (Tex.Crim.App. 1996).

Habeas corpus relief is based on the principle "that in a civilized
society, government must always be accountable to the judiciary for a man's
imprisonment: if the imprisonment cannot be shown to conform with the fundamental
requirements of law, the individual is entitled to immediate release." Id.
at 402. The Texas Constitution vests in the Courts the power to issue writs
of habeas corpus (Texas Constitution, Art. 5, § 5), construed to encompass
claims raising jurisdictional or fundamental defects or constitutional issues.
Ex parte Tuley, 109 S.W.3d 388 (Tex.Crim.App. 2002); Ex parte Graves, 70 S.W.3d

108, 109 (Tex.Crim.App. 2002). Claims of actual innocence raise issues of constitutional magnitude.

### B. **Federal Due Process.**

Assertions of actual innocence are categorized in Herrera-type claims. Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 353, 122 L.Ed.2d 303 (1993). See Elizondo, 947 S.W.2d, at 208. A Herrera-type claim involves a substantive claim in which the applicant asserts a bare claim of innocence based solely on newly discovered evidence. Schlup v. Delp (1995) 513 U.S. at 314, 115 S.Ct. 351. See also Elizondo, 947 S.W.2d, at 208. In Herrera, decision serves as sound precedent for recognition of habeas relief when an actual innocence claim alone is raised. In Elizondo, the Court extended its holding, verifying that the Due Process Clause of the Fourteenth Amendment forbids the incarceration of an innocent person. Elizondo, 947 S.W.2d, at 204.

This principle is essential in a constitutional system. "After all, the central purpose of any system of criminal justice is to convict the guilty and free the innocent." Herrera, 506 U.S. 390, at 399. See also United States v. Nobles, 422 U.S. 225, 230, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

Relief for the actually innocent arises under the Due Process Clause of the Fourteenth Amendment. In fact, both procedural and substantive due process demand habeas relief under those circumstances.

### C. **Due Process, Generally.**

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law". The Due Process Clause of the Fourteenth Amendment states the same as to the action of a State. The Clause protects individuals against two types of government actions. "Substantive due process" prevents the government from engaging in conduct that "shocks the conscience" (Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).), or intereferes with rights

"implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Additionally, even when government action depriving a person of life, liberty, or property, survive substantive due process scrutiny, it must be implemented in a fair manner. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This requirement traditionally is denominated "procedure due process." United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Both procedural and substantive due process bases for constitutional exoneration of a prisoner with a clear and convincing claim of actual innocence.

The Supreme Court, expressed in Schlup that when asserting a Herrera claim, the applicant must "demonstarte by clear and convincing evidence that no reasonable juror would convict him in light of the new evidence." Elizondo, 947 S.W.2d at 209.

### D. Substantive Due Process.

Knowingly imprisoning the innocent is an imposition purposeless restraint. As the Court recognized in Elizondo, a constitutional society founded on due process simply cannot tolerate punishing the innocent. See Elizondo, 947 S.W.2d at 209.

As the Herrera dissent underscored, however, and the Court of Criminal Appeals affirmed in Elizondo, the habeas applicant does not attack the jury verdict. "Nowhere does [the] applicant claim that the verdict is invalid or should be invalidated. What he wants is a new trial based on newly discovered evidence which he claims proves his innocence." Elizondo, 947 S.W.2d at 209. However, the question is not whether the Constitution forbids punishment of a person who is legally guilty but factually innocent, but whether it denounces punishing one who would be found legally innocent if tried today. See Charles v. Morse, "Habeas Corpus and 'Actual Innocence'"; also Herrera v. Collins, 123 S.Ct. 353 (1993), 16 Harv.J.L. and Pup. Pol'y 848 (1993). The focus is

3

on the present, not on the prior trial. This issue is amenable to substantive
due process analysis.

Habeas is the essential and only viable means of vindicating actual
innocence claims. "The principal purpose of the Writ of Habeas Corpus is to
serve as a bulwark against convictions that vioate fundamental fairness."
Engle v. Isaac, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1992) (quoting
Wainwright v. Sykes, 433 U.S. 72, 97, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1997),
Stevens, J., concurring.) Habeas corpus is the last judicial inquiry into
the validity of a criminal conviction, the final opportunity of the courts
to correct their inevitable errors.

The courts turn the Constitution on its head if it vests in the unreviewable
discretion of executive officals the province of correcting the errors of
the judiciary. The very concept of constitutional government is undermined.
If the judicial system erred in convicting the innocent, the judicial system
must correct its error. Habeas corpus stands as the only viable basis for
achieving due process relief.

Petitioner presents newly discovered evidence of recent declaration(s)
of Josiah Lee Pacheco, which proves petitioner's innocence of charged offense.

Josiah Lee Pacheco has testified at trial and in his declaration,
which now states that on March 12, 2008, after he was shot while riding in
the abulance to the hospital that he never told Officer Joshua Jackson that
it was Chava Lopez that shot him.

Josiah Pacheco declared that on March 13, 2008, at the first hospital
visit, Officer Clinkenbeard had shown Josiah Pacheco a photograph lineup while
pointing at Salvador Lopez's picture while asking Pacheco who was Salvador
Lopez in the photo, not who shot him. The second hospital visit, Officer Clinkenbeard
kept showing Pacheco a photograph lineup while pointing to Salvador Lopez's
picture and asking Pacheco 'who shot you?' while Pacheco was under heavy medication

He was therefore very disoriented at the time when Pacheco said he thought it was Lopez who shot him, because Pacheco had beaten up Salvador Lopez's brother and Pacheco therefore thought Lopez had a problem with him. But Pacheco admits that he was mistaken, and Josiah Pacheco said Salvador Lopez never shot him.

Josiah Pacheco declared that Officer Clinkenbeard convinced him to say over the telephone, to Salvador Lopez, "you shot me", even though this was not true.

Josiah Pacheco declares Officer Clinkenbeard kept pressing him hard with aggressive questions like repeatedly asking him what happened, who shot you, and who is Salvador Lopez in this photograph lineup whil pointing to Salvador Lopez. This had Pacheco confused, to the point where for a second he thought it was Salvador Lopez who had shot him because Pacheco believed he and Lopez had a problem on account of Pacheco beating up Lopez's older brother, which is the reason why Pacheco thought it was Salvador Lopez. But Pacheco was mistaken, and Josiah Pacheco said Salvador Lopez never shot him.

Josiah Pacheco declares that Salvador Lopez had never shot him which is the reason why Josiah Pacheco had wanted to attend Salvador Lopez's preliminary hearing—to testify on behalf of Salvador Lopez. But before the preliminary hearing, Detective Cotties Clinkenbeard took Josiah Pacheco to a room where Pacheco met with people that he still, to this day, does not know, and asked Josiah Pacheco several questions.

Josiah Pacheco declared that the main question they asked him was "are you goin to say that Salvador Lopez shot you?" and Josiah Pacheco told them that he was unwilling to lie by saying that Salvador Lopez shot him. However, in the end, Pacheco could tell they became very ypset that he would not go along with them. (See 'Declaration of Josiah Lee Pacheco', dated JAN 1, 2014.)

Mr. Pacheco states, and confesses, that the shooting had nothing to do with gang activity, and he now admits that the shooting was behind a drug deal gone bad between Pacheco and a person he describes as a "paisa" (a Mexican from Mexico). (Ibid.)

Mr. Pacheco states he withheld some facts of the crime to prevent the law and his parents from finding out the truth of the incident, therefore going along with the detective in pointing the finger at petitioner. (Ibid.)

Mr. Pacheco claims when finally coming to his natural state of mind, and was no longer under heavy medication and disoriented as a result, that he wanted to come clean that Mr. Lopez did not shoot him. But, afraid of getting arrested for perjury, Mr. Pacheco states that he tried to cover that up by saying 'no snitching' is the #1 rule in gang culture. However, he admits it was all part of his theory that in order to get the law out of his way, Mr. Pacheco also claims that there were two shootes—one whom he claims was the 'paisa' of the earlier incident between the paisa and Mr. Pacheco.

REVIEW IS NEEDED TO DETERMINE WHETHER THE COURT OF APPEAL ERRED IN DENYING PETITIONER'S REQUEST FOR EVIDENTIARY HEARING.

As stated above, Mr. Pacheco's newest declarations demonstrate, by clear and convincing evidence, that petitioner is innocent of charges. Petitioner requested an evidentiary hearing to focus on the newest statements by Mr. Pacheco, specifically: 1) he withheld information from law enforcement; 2) that the shooting was behind a drug deal gone bad and petitioner was not the perpetrator; 3) that there were two shooters, including a person whom Pacheco describes as a 'paisa'.

If discovered that two weapons were fired, it is significant for an evidentiary hearing to produce such evidence to demonstarte that the newest declarations can be convincing, and no reasonable juror would convict petitioner in light of the new evidence.

## EVIDENTIARY HEARING

A petitioner on habeas corpus is entitled to an evidentiary hearing where the petitioner establishes a "colorable" claim for relief, and where the petitioner has never been accorded a state or Federal hearing on his claims. Earp v. Oronski, 431 F.3d 1158, 1167 (9th Cir. 2005), citing Townsend v. Sain, 372 U.S. 293 (1963) and Keeney v. Tumayo-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable" claim, a petitioner is merely required to allege specific facts which, if true, would entitle him to relief.

On the other hand, no AEDPA defence is due where the state court has made an "unreasonable" determination of the facts, and: "[where] a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." Taylor v. Maddox, 366 F.3d 991, 1001 (9th Cir. 2004). As a result, 1) Petitioner is entitled to an evidentiary hearing in this court before the court can make any crdibility determination on the facts alleged in the petition, and 2) any controverted "facts" found by the state court while denying a request for an evidentiary hearing necessarily result from an "unreasonable determination" of the facts, and hence are not entitled to any presumption of correctness. Earp, supra, at 1167; Taylor, supra, at 1101 ["where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can be attached to it."].

In the instant case, petitioner makes a substantial showing of the denial of constitutional rights, and newly presented evidence exonerating petitioner of his conviction and sentence. In light of these issues, and evidentiary hearing is appropraite and called upon.

## CONCLUSION

For the reasons discussed herein and above, Petitioner respectfully

requests this court to:

1) Issue a writ of habeas corpus or order to show cause to the Director of the Department of Corrections and Rehabilitation to inquire into the lawfulness of petitioner's conviction;

2) set aside petitioner's conviction in the Sutter County Superior Court, case no. CRF081476, to be reversed, and that petitioner be immediately released from custody;

3) issue an order directing, at a certain date and time, that an evidentiary hearing be conducted before the appropriate court or before a referee;

4) issue an order directing, at a certain date and time, that an evidentiary hearing be conducted before the appropriate court as to why petitioner's conviction in Sutter County Superior Court case no. CRF081476 shout not be reversed and as to why petitioner should not be immediately released from custody; and

5) grant petitioner any and all further relief that is appropriate in the interest of justice.

Respectfully submitted,

Dated: 3·5·16

Salvador Lopez
Defendant and Petitioner

8

ARGUMENT

**II**    REVIEW IS NEEDED TO DETERMINE WHETHER THE
GANG EXPERT RELIED ON TESTIMONIAL HEARSAY,
VIOLATING PETITIONER'S CONFRONTATION RIGHT,
AND WHETHER TRIAL COUNSEL WHO OFFERS
ONLY A HEARSAY OBJECTION RENDERS
INEFFECTIVE ASSISTANCE.

This case poses the question of whether comments about gang
membership and activities, made by gang members to police officers
performing their duties, are nontestimonial on the theory that they "would
be useful to the police as part of their general community policing
responsibilities quite separate from any use in some unspecified criminal
prosecution" (*People v. Valadez, supra,* 220 Cal.App.4th at p. 36), and so
are not the product of conversations "conducted with the purpose of
creating a testimonial substitute for use in a future prosecution." (Opinion,
p. 22.) Is there any meaningful distinction between facts potentially
relevant to later criminal prosecution (a testimonial purpose under *Davis v.
Washington, supra,* 547 U.S. 813) and facts useful for "general community
policing responsibilities" or "to merely deter future criminal activity" (a
non-testimonial purpose according to *Valadez* and the majority opinion
here), given that the deterrence of future criminal activity is normally
achieved by prosecuting criminals to incapacitate them from criminal
activity through imprisonment and to discourage others from following the
same course? If the police ordinarily gather gang information both for use

9

in prosecutions and to deter future criminal activity, does the purpose of deterring future criminal activity shield all information gathered by the police from the Confrontation Clause? Does responding to an "ongoing emergency" which, under *Davis v. Washington, supra,* 547 U.S. 813, 822 and *Michigan v. Bryant* (2011) 562 U.S. 344, indicates a non-testimonial purpose, encompass gathering information potentially useful both to deterring possible future criminal activity and to prosecuting alleged gang crimes? Or does examination of those cases suggest a narrower scope for the category of responding to an ongoing emergency?

As this Court has recognized by granting review in *People v. Sanchez*, S216681, review of this important and controverted question is needed. Also needed is review of the related question of whether trial counsel, by asking only that incompetent hearsay be excluded, rendered ineffective assistance. (U.S. Const. 6th Amend., *Strickland v. Washington* (1984) 466 U.S. 668.)

III.    REVIEW IS NEEDED TO DETERMINE WHETHER THE COURT OF APPEAL ERRED IN DECIDING THAT PETITIONER HAD, BY ENTERING AN ADMISSION IN A PRIOR JUVENILE ADJUDICATION, WAIVED HIS RIGHT TO CONFRONT, IN A LATER TRIAL OF A DIFFERENT ALLEGED CRIME, THE DECLARANTS WHOSE STATEMENTS WERE REPORTED IN A SHERIFF'S REPORT RELATED TO THE EARLIER JUVENILE ADJUDICATION.

The Court of Appeal ruled that the gang expert's testimony reciting assertions of fact in a sheriff's report related to petitioner's prior juvenile adjudication was admissible because "as to this testimony, defendant had previously waived his confrontation rights as to those charges when he entered an admission to the offenses. An objection based on the confrontation clause would have been without merit." (Opinion, p. 22.)

10

The parties had not raised or argued the question of whether, when he entered an admission in the juvenile adjudication, petitioner waived, for all subsequent uses, his confrontation rights with respect to the extrajudicial declarations in a sheriff's report. The Court of Appeal denied petitioner's petition for rehearing, however.

The Sixth Amendment prohibits the admission at trial of testimonial hearsay unless the declarant is unavailable and has been subject to cross-examination. (*Crawford v. Washington, supra,* 541 U.S. 36.)  Waiver is the "intentional relinquishment or abandonment of a known right or privilege." (*Johnson v. Zerbst* (1938) 304 U.S. 458, 464.)  It does not appear that, before petitioner entered his admission in juvenile court, he surrendered, for all time and all purposes, his right to confront witnesses whose declarations were related in a sheriff's report.  Does a waiver of confrontation rights in a juvenile adjudication, for purposes of entering an admission, or the admission itself, waive for all future purposes confrontation of anyone whose testimonial hearsay was included in any law enforcement report pertaining to the underlying incident?

This is an important question of law related to the unsettled question of what facts are admitted by a plea.  (Contrast *Descamps v. United States, supra,* 133 S.Ct. at p. 2282 [the basic statutory elements of the crime], *People v. French, supra,* (2008) 43 Cal.4th 36, 49 [facts shown to have been understood by the parties as admitted by the plea], and *People v. Guerrero* (1988) 44 Cal.3d 343, 355 [facts contained within the entire record of conviction].  Review is needed to resolve this important question.

11

IV.    REVIEW IS NEEDED TO DETERMINE WHETHER THE
VOLUMINOUS EVIDENCE OF PRIOR BAD ACTS BY
PETITIONER AND HIS FAMILY MEMBERS, DESPITE
THE AVAILABILITY OF OTHER, LESS CONFUSING
AND LESS UNFAIRLY PREJUDICIAL EVIDENCE OF
THE GANG'S PATTERN OF CRIMINAL CONDUCT,
VIOLATED PETITIONER'S RIGHTS UNDER EVIDENCE
CODE SECTIONS 1101 AND 352 AND THE DUE
PROCESS CLAUSE.

A. Background

1. Prior Offenses Involving Petitioner.

Through its gang expert, Officer Moe, the prosecution presented
evidence of prior offenses committed by petitioner, ostensibly as additional
proof of the pattern of criminal gang activity required to prove that the
Sureños are a criminal street gang.

Moe testified that Pedro Alvarado, a Sureño, was convicted of
carrying a loaded firearm in public after a traffic stop resulted in the
discovery of the weapon in November of 2006, and that petitioner, who was
also in the car, was adjudicated a ward of the court for carrying a concealed
weapon in a vehicle. (2RT 484-488.)

Moe also testified about an incident that occurred on March 28,
2005. (2RT 488-492.) According to Moe, ten youths in blue, including
petitioner, attacked two Norteños. (2RT 488-489, 491.) Petitioner was
adjudicated for battery with serious injury (§243, subd. (d)) with a gang
enhancement. (2RT 488.) This offense, however, is not among the offenses
that serve to prove the criminal nature of a street gang. (See § 186.22,
subd. (3).)

12

2.  Predicates Involving Petitioner's Brother.

Moe also testified that in May of 2008, Fidencio Mendoza, a Sureño, and Ignacio Lopez, petitioner's older brother, were convicted of assault with a firearm. (2RT 479-483.) According to Moe, Ignacio Lopez and another person distracted the victim, allowing Mendoza to approach from behind to assault the victim. (2RT 481.)

3.  Other Evidence Regarding Petitioner's Family Members.

The prosecution also presented evidence that petitioner's two older brothers and two cousins are active members of the Sureños. (2RT 493.)

B. Petitioner's Argument

Petitioner argued that his juvenile adjudications, his brother's conviction, and his other brother's and his cousins' Sureño activities added little or no probative value to the prosecution's case that the Sureños are a criminal street gang. The conviction of Alvarado for the November 2006 firearms offense served as one of the two predicates which the prosecution needed in order to prove that the Sureños have displayed the pattern of criminal gang activity necessary for the criminal street gang allegations. Adding petitioner's adjudication added no probative value if either petitioner or Alvarado was merely an aider and abettor. (See *People v. Zermeno* (1999) 21 Cal.4th 927, 932.) The prosecution did not establish that both Alvarado and petitioner were direct perpetrators. Petitioner's adjudication for battery stemming from the March 2005 offense could not serve as one of the necessary predicates, for that offense is not listed in section 186.22, subdivision (e). As for Ignacio Lopez's offense, it is clear that, by distracting the victim, Ignacio Lopez acted as an aider and abettor, so the crime committed by him and Mendoza constituted a single predicate.

13

(*People v. Zermeno, supra,* 21 Cal.4th at p. 932.) Thus Ignacio Lopez's prior conviction, like petitioner's prior adjudications, did not add any probative value to the prosecution's proof of the pattern of criminal gang activity.

Petitioner acknowledged there may be some benefit for the prosecution in offering more than two offenses as insurance against the possibility that the jury will reject an offense as a predicate, but argued that there could be no such legitimate benefit to using offenses that do not qualify under section 186.22, subdivision (e) (petitioner's battery adjudication) or offenses in which the evidence of another's conviction renders the conviction of an aider and abettor useless as a predicate. What is more, given Officer Moe's depiction of the Sureños as numerous and violent (2RT 460-469), undoubtedly many other qualifying convictions could have been offered if the prosecution wanted a still larger surplus of predicates.

Petitioner also argued that the evidence offered little or no probative value with respect to his intent and was unduly prejudicial. (See Evid. Code §§ 1101, 352.) Petitioner's brother's offense and his other relatives' Sureño activity had no tendency in reason to prove any intent on petitioner's part. Assuming arguendo that petitioner was the shooter, the ascertainment of whether he intended to kill and whether he intended to benefit a criminal street gang would not be advanced by any knowledge of his brother's criminal history or his relatives' involvement in the Sureños. Petitioner's own priors were of negligible value in proving intent to kill. Intent was not seriously in issue. As the prosecutor noted in his summation, "the main issue in this case is whether or not Mr. Lopez is the shooter." (3RT 700.) Petitioner offered an alibi defense. If petitioner was the shooter, intent to kill would be inferred from the shooting itself. Merely

cumulative evidence of uncharged offenses should not be admitted to show intent. (*People v. Balcom* (1994) 7 Cal.4th 414, 423.)

Nor does petitioner's prior adjudication for gun possession, which apparently was not adjudicated as a gang crime (2RT 486-488), afford any basis for inferring intent to benefit the gang in the instant offense, if indeed it was petitioner who shot Pacheco.

The prior offenses offered little or no probative value regarding motive, which may be relevant "only insofar as it tends circumstantially to increase the likelihood that the defendant, rather than another, committed the charged offense." (*People v. Earle* (2009) 172 Cal.App.4th 372, 393.). The prosecution offered evidence supporting two motives: that petitioner may have wanted to avenge an attack on his brother, and that petitioner may have wanted to improve his standing in the gang. Petitioner argued that his relatives' offenses and Sureño activity were of no value in proving that he had a motive to shoot Pacheco or that it was he who did shoot Pacheco. Nor were petitioner's own prior offenses of value in proving any motive to avenge an attack on petitioner's brother. And even if one of petitioner's priors could be associated with the proffered motivation of gang animus, that fact would completely fail to distinguish petitioner from all other Sureños in that regard.

Petitioner also argued that the evidence offered little or no probative value with respect to a common design or plan. The charged offense concerned a shooting at close range of a person who either continued to be or had formerly been a Norteño, by someone who emerged from a car that contained several persons. None of petitioner's prior offenses displayed those features. The priors did not involve any use of a gun against anyone. Nor are the features of those prior offenses so distinctive as to assist the jury in identifying petitioner as the shooter in the present case. They

15

certainly do not amount to a signature style proclaiming petitioner as the author of all the offenses.

Petitioner's brother's prior offense has no probative value with respect to common design or plan. Neither does the active Sureño membership of petitioner's other brother and cousins have any probative value with respect to a common design or plan.

Petitioner also argued that the challenged evidence was not required to prove petitioner's knowledge of the gang's activities, for purposes of the section 186.22, subdivision (a) charge of active participation in a criminal street gang. Petitioner's prior gun possession adjudication, which apparently was not adjudicated as a gang crime, offers no probative value on this point. The other prior bad act evidence was likewise unnecessary to prove such knowledge. The jury would surely not find active participation unless it also found true the attempted murder charge and its gang enhancement. If the jury determined that petitioner was not involved in this shooting, or that he did shoot Pacheco, but not in association with a gang, at a gang's direction, or for the benefit of a gang, they certainly would not have found that he was guilty of active participation. On the other hand, if they did find petitioner guilty of the attempted murder charge, and found the attempted murder to have been committed "for the benefit of, at the direction of, or in association with any criminal street gang" (§186.22, subd. (b)), that finding would suffice also to show petitioner's knowledge of the gang's criminal activity, needed for the offense of active participation, because attempted murder is plainly criminal. Thus the evidence of the prior offense was superfluous – it added no probative value. The prejudicial impact – its improper use as evidence of propensity – greatly outweighed any probative value it could possibly supply on the issue of petitioner's knowledge.

Petitioner argued that the admission of the prior offenses by petitioner and his family members and of his family members' gang associations enabled the prosecution to paint a family portrait in lurid gang colors, making it impossible for the jury to assess the evidence without improperly relying on personal and familial disposition.

Petitioner argued that the admission of the prior offenses committed by petitioner and his brother and the evidence of his other brother's and cousins' involvement in the Sureños rendered the trial fundamentally unfair, in violation of due process. (U.S. Const., 5th & 14th Amends.) The question of whether petitioner was the shooter was a close one. The only evidence that he was the shooter was Pacheco's out-of-court identification of petitioner, an identification which Pacheco quickly repudiated. Pacheco's later statement that it was Norteños, rather than Sureños, who shot at him and that they did so to punish him for leaving the gang was highly plausible. He said that he had earlier blamed petitioner because petitioner was in his mind. (1RT 221.) Pacheco told Clinkenbeard that Pacheco had previously beaten petitioner's brother, and he and petitioner were not on good terms (1Aug. CT 6), a circumstance that might have prompted a false accusation. Had they not been subjected to the barrage of suggestions that petitioner and his entire family were deeply entrenched in hatred of Norteños and in violent conduct, and that petitioner was thus disposed to commit the charged offenses, the jurors might well have harbored a reasonable doubt that petitioner was the shooter.

C. The Court of Appeal's Opinion

The Court of Appeal ruled that the evidence "was relevant on the issues of the pattern of criminal conduct, defendant's active participation in the gang, and his knowledge of the gang's purpose." (Opinion, p. 10.) The

17

prosecution was not required to use offenses of Sureños other than petitioner and his family members. (Opinion, pp. 10-11.) The evidence of petitioner's prior offenses, even non-gang predicate offenses, "was relevant to establish that defendant's involvement with the gang was not nominal or passive." (Opinion, p. 11.) "[T]he evidence that defendant's family members had been involved in gang-related offenses was relevant to establish defendant had knowledge 'that the gang's members engage in or have engaged in a pattern of criminal gang activity.'" (Opinion, p. 11, quoting *People v. Albillar* (2010) 51 Cal.4th 47, 56.)

D.  Review is Needed.

In view of the great likelihood of prejudice from other crimes evidence (see *People v. Ewoldt* (1994) 7 Cal.4th 380, 404, and *People v. Thompson* (1980) 27 Cal.3d 303, 318) and the common use of such evidence in gang cases, petitioner suggests that review is needed to ensure against unduly prejudicial use and violations of due process.

V.    REVIEW IS NEEDED TO DETERMINE WHETHER A
      TRIAL COURT ERRS BY FAILING TO INSTRUCT THE
      JURY THAT THE EVIDENCE OF PRIOR BAD ACTS BY
      THE DEFENDANT AND HIS FAMILY MEMBERS IS
      ADMITTED FOR A LIMITED PURPOSE AND
      WHETHER TRIAL COUNSEL WHO FAILS TO MAKE
      ADEQUATE REQUEST FOR SUCH INSTRUCTION
      RENDERS INEFFECTIVE ASSISTANCE.

A. Background

Counsel did not request, and the court did not provide, an instruction informing the jury that they could not use the evidence of either petitioner's

18

or his brothers' or his cousins' prior offenses as evidence of personal or familial disposition to commit crimes of the type alleged in this case.

### B. Petitioner's Argument

Petitioner argued that the court should have specifically instructed the jury not to draw any inference of familial or personal disposition to commit the charged crimes.

The prosecutor explicitly urged the jury to draw the impermissible inference that Ignacio Lopez's offense made it more likely that petitioner had committed the charged offenses, urging the jury to reason "Big brother, little brother" and to see "a pattern of violence by that family ..." and so infer that petitioner was disposed to commit the charged crimes. (3RT 666, 705.) Although the trial court has no *sua sponte* duty to give a limiting instruction as to the permissible uses of admissible evidence, there may be an exception where "unprotested evidence ... is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Hernandez, supra*, 33 Cal.4th at pp. 1051-1052, quoting *People v. Collie* (1981) 30 Cal.3d 43, 64.)

Counsel's failure denied petitioner's right to counsel. (U.S. Const., 6th & 14th Amends.; *Strickland v. Washington, supra,* 466 U.S. 668.) Competent counsel would not permit the jury to infer from the uncharged crimes evidence that petitioner and his family were disposed to engage in crimes of violence against Norteños. The failure to request a limiting instruction could not have resulted from an informed tactical choice. Counsel sought to exclude propensity evidence by requesting such exclusion during the in limine hearing. It cannot be supposed that counsel wanted to exclude propensity evidence and at the same time wanted the

19

jury to be ignorant of its responsibility to refrain from using the prior crimes evidence as proof of propensity.

C. The Court of Appeal's Opinion

The Court of Appeal ruled that this is not an extraordinary case in which the evidence was both "'highly prejudicial and minimally relevant to any legitimate purpose,'" and that the court had no sua sponte obligation to instruct on this point. (Opinion, p. 12, quoting *Hernandez, supra*, 33 Cal.4th at pp. 1051-1052.) The Court decided that "defense counsel might reasonably have concluded it was best if the court did not explain all the ways in which the evidence could be used against defendant. (*Hernandez, supra*, 33 Cal.4th at pp. 1052-1053.)" (Opinion, p. 12.)

D. Review is Needed.

Especially in view of the prosecutor's invitation to the jury to reason that petitioner sought to emulate the crime of his older brother and to see petitioner's family as engaging in a pattern of violence, a simple instruction that prior crimes could not be used to infer propensity was essential. It is unreasonable to suppose that a request for such instruction would entail detailed instruction on permissible uses. Petitioner suggests that the question presented is important and likely to recur, and that this Court's guidance is needed.

20

VI.    REVIEW IS NEEDED TO DETERMINE WHETHER
       TRIAL COUNSEL'S FAILURE TO OBJECT TO CERTAIN
       UNSOLICITED TESTIMONY BY THE GANG EXPERT
       AND CERTAIN COMMENTS BY THE PROSECUTOR IN
       ARGUMENT AMOUNTED TO INEFFECTIVE
       ASSISTANCE.

A. Background

The prosecution's gang expert testified that the Mexican Mafia
controls gang members on the street, among other ways, by using attorney-
client privilege. (2RT 468.) Petitioner's trial counsel did not make a
motion to strike this testimony.

The prosecutor argued "The dates, the shooting of Isaac Gomez [by
petitioner's brother], December 31, '07. Two and half months later is when
Mr. Lopez tried to shoot Mr. Pacheco. Big brother, little brother." (3RT
666.) Later, he said petitioner's "older brother did try to kill a rival
Norteño just two and a half months before Mr. Lopez tried to kill a Norteño
gang member. That definitely shows a pattern of violence by that family, a
pattern of violence against the rival gang. A pattern of violence that shows
that family is out to do whatever it takes for their gang." (3RT 705.)

In addition, the prosecutor failed to prevent the gang expert from
blurting out irrelevant information about petitioners' family members'
involvement in criminality (2RT 481-483, 493) and his comment that the
Mexican Mafia uses attorney-client privilege to control gang members on
the street. (2RT 468.)

B. Petitioner's Argument

Petitioner argued that the gang expert cast aspersions upon defense
attorneys as a class, suggesting that they are generally so foolish or so

21

corrupt that they are easily manipulated by the Mexican Mafia. Although it
was a police officer and not the prosecutor who made the remark, the effect
was the same. "An attack on the defendant's attorney can be as seriously
prejudicial as an attack on the defendant himself, and, in view of the
accepted doctrines of legal ethics … it is never excusable." (5 Witkin &
Epstein, Cal. Criminal (2d ed. 1989), § 2914, p. 3570, quoted in *People v.
Hill* (1998) 17 Cal.4th 800, 832.) Such disparagement of counsel
undermines the Sixth Amendment rights to counsel and due process of law.
(See *Sizemore v. Fletcher* (6th Cir. 1990) 921 F.2d 667, 670; *United States
v. McLain* (11th Cir. 1987) 823 F.2d 1457, 1462.) Portraying defense
counsel in general as the unwitting or willing puppets of the Mexican Mafia
could only inflame the jury against both counsel and client and arouse the
suspicion that petitioner's defense was likewise manipulated by the
Mexican Mafia. Aspersions upon defense counsel "severely damage an
accused's opportunity to present his case" and amount to "an impermissible
strike at the very fundamental due process protections" of the federal
Constitution. (*Bruno v. Rushen* (9th Circ. 1983) 721 F.2d 1193, 1195.)

Petitioner also argued that the prosecutor committed misconduct. In
his "Big brother, little brother" argument and his portrayal of petitioner's
family, the prosecutor improperly urged the jury to infer a family
disposition to commit crimes. The prosecutor also misrepresented
petitioner's brother's conviction. Ignacio Lopez was convicted of assault
with a firearm, not attempted murder. (2RT 482.)

In addition, the prosecutor failed to prevent Officer Moe from
blurting out irrelevant information about petitioners' family members'
involvement in criminality (2RT 481-483, 493) and his comment that the
Mexican Mafia controls gang members on the street, among other ways, by
using attorney-client privilege. (2RT 468.)

22

Prosecutorial misconduct under state law includes 'the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Hill, supra*, 17 Cal.4th at p. 819; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Urging misuse of the evidence as showing personal and familial disposition towards criminality in violation of Evidence Code section 1101 and misrepresenting the evidence are deceptive and reprehensible methods employed to persuade the jury. Also, prosecutors have the duty to guard against inadmissible statements from their witnesses and are guilty of misconduct when they violate that duty. (*People v. Warren* (1988) 45 Cal.3d 471, 481-482.)

Petitioner also argued that by portraying petitioner and his family as immersed in criminal violence, by urging the jury to draw from that portrayal the conclusion that petitioner committed this particular crime, by misrepresenting petitioner's brother's conviction as attempted murder and suggesting that if petitioner's brother tried to kill a Norteño, petitioner must have done the same, and by failing to curb Officer Moe's recitations of irrelevant evidence relating to uncharged criminality and the Mexican Mafia's supposed manipulation of defense attorneys to issue orders to gang members on the streets, the prosecutor engaged in misconduct so pervasive and inflammatory as to deprive petitioner of his federal rights to due process and a fair trial. (See *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643; *People v. Harris* (1989) 47 Cal.3d 1047, 1084.)

Petitioner argued that, by failing to object or to request any ameliorative action, trial counsel rendered ineffective assistance in violation of the right to counsel. (U.S. Const., 6th & 14th Amends.; *Strickland v. Washington, supra*, 466 U.S. 668.) Counsel could not have made an informed tactical choice to allow the jury to hear the irrelevant evidence about uncharged crimes committed by petitioner's family members, the misrepresentation of petitioner's brother's conviction, the prosecutor's

23

exhortation to the jury to infer criminal disposition; or the gang expert's aspersions upon defense counsel.  In view of the victim's contradictory statements regarding the identity of his assailant, it is at least reasonably probable that the jurors would have entertained a reasonable doubt that the shooter was petitioner had they not been exposed to this improper and inflammatory commentary.

C. The Court of Appeal's Opinion

The Court of Appeal ruled that petitioner failed to meet his burden to show that there could be no satisfactory explanation for counsel's inaction. (Opinion, p. 24.)  The Court saw Moe's comment about the Mexican Mafia as a passing and obscure comment, not likely to be understood by the jury as impugning defense counsel as a class or in particular.  Because any objection would have drawn more attention to the comment, counsel could reasonably have decided that it was best to keep silent.  (Opinion, p. 25.)

The Court of Appeal decided that the prosecutor's comments did not suggest a familial propensity to commit crimes, and that they "were a fair comment on the evidence and included what was plainly the prosecutor's inference from that evidence."  (Opinion, p. 26.)  According to the Court, there was no misconduct, hence no ineffective assistance.  (*Ibid.*)

D. Review is Needed.

If defense counsel must choose between forfeiting a claim of error and highlighting the wrong, to the defendant's detriment, by objecting, prosecutors and testifying police officers will understand that they may expose the jury to improper commentary with little fear of reproach or other adverse effect.  Only this Court's guidance can protect against such improper conduct.  Also, this Court's guidance is needed to help counsel

and courts distinguish between fair comment on the evidence and improper argument.  Petitioner respectfully suggests that review is needed.

VII    REVIEW IS NEEDED TO DETERMINE WHETHER THE TRIAL COURT ERRED AND VIOLATED PETITIONER'S DUE PROCESS RIGHTS AND RIGHT TO AN IMPARTIAL JURY BY DENYING HIS MOTION TO BIFURCATE THE GANG CHARGES AND ENHANCEMENTS FROM THE TRIAL OF THE OTHER CHARGES.

A. Background

Petitioner moved to bifurcate trial on the charge of active participation in a criminal street gang and the gang enhancements.  (CT 134-135.)  The trial court denied the motion, ruling that petitioner had not shown that the prejudicial effect outweighed the probative value.  (1RT 78)

B. Petitioner's Argument

Petitioner argued that the gang charges should have been bifurcated because the risk that the gang evidence would inflame the jury against him was immense while the relevance of the evidence to the charges of attempted murder, assault, personal discharge of a firearm and great bodily injury was negligible.  Such evidence "threatens to sway the jury to convict regardless of the defendant's actual guilt."  (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.)  The shooter himself made no reference to any gang. The victim at first said that some Sureño shot him (1RT 144, 153); then that petitioner shot him (1RT 173-174); then that he was shot by Norteños. (2RT 379-380.)  The victim's shifting tales of an attack by a Sureño, by petitioner, by Norteños, did not make the gang evidence significantly relevant to the proof of the underlying offenses.

25

There was evidence that, if the shooter was petitioner, his motivation was a personal one: Pacheco told the police that petitioner had a problem with him because Pacheco had beaten up petitioner's older brother. (1ACT 6.) By alleging a gang crime, despite the questionable evidence, the prosecution procured the opportunity to present the full storm of evidence of gang depravity to bolster its weak case.

Petitioner argued that the failure to bifurcate the gang charges violated his right to due process. (U.S. Const., 5th Amend. See *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

C. The Court of Appeal's Opinion

The Court of Appeal was of the opinion that, whenever a substantive gang offense is charged, gang evidence is relevant and any potential prejudice is dispelled. (Opinion, p. 8.) Even without the substantive gang offense, the Court ruled, the gang evidence "was relevant to explain the inconsistencies between Pacheco's trial testimony and pretrial statements." (*Ibid.*)

D. Review is Needed.

Review is needed to address the Court of Appeal's supposition that the inclusion of a substantive gang charge precludes bifurcation. Petitioner respectfully suggests that such holding can only prompt prosecutors to add a substantive gang charge to every document charging a gang enhancement, as insurance against bifurcation. Whether the Court of Appeal is correct in its analysis is an important question that merits this Court's review.

## VIII    REVIEW IS NEEDED TO DETERMINE WHETHER THE CUMULATIVE ERRORS AT TRIAL WERE PREJUDICIAL AND DENIED PETITIONER DUE PROCESS.



Petitioner argued that the series of errors rose to the level of reversible prejudicial error and deprived him of his constitutional right to due process under the law, compelling reversal. (U.S. Const., 5th & 14th Amends. See *People v. Hill, supra,* 17 Cal.4th at p. 844; *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622.) To add bulk to its flimsy case against petitioner, the prosecution arraigned not only petitioner's whole life, but that of his brothers and his cousins.[2] This barrage of inadmissible and inflammatory evidence, combined with Officer Moe's depiction of defense counsel in general as the puppets of the Mexican Mafia and the prosecutor's suggestion that petitioner was disposed to commit the charged offense because he and his family were criminal gangsters, harmed petitioner and denied basic principles of fairness.

The critical importance of the rights at stake and the prejudicial effect of the errors make this an important question of law meriting review.

---

[2] *Harrison's Trial,* 12 How. St. Tr. 834, 864 (Old Bailey 1692) (Holt, C.J.) (excluding propensity evidence in a murder trial, remarking, "Hold, what are you doing now? Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter.")

IN THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SUTTER

SALVADOR LOPEZ,

      Defendant/Petitioner,

VS.

PEOPLE OF THE STATE OF
    CALIFORNIA

REAL PARTY IN INTEREST

MARTIN D. BITTER, WARDEN
DEPARTMENT OF CORRECTIONS AND
      REHABILITATION
KERN VALLEY STATE PRISON
DELANO, CALIFORNIA,

      Plaintiff and Respondent.

DECLARATION OF JOSIAH LEE PACHECO
IN SUPPORT OF PETITION FOR A WRIT
OF HABEAS CORPUS

---

I, Josiah Lee Pacheco, hereby declare:

That I am an adult presently incarcerated in the California state Department of Corrections and Rehabilitation at Kern Valley State Prison, P.O. Box 5104, in the city of Delano, California, 93216. My prison identification number is AA-4932.

I am in good health and do not suffer from any ailment that would detrimentally affect my mental capacity or ability to observe events.

I am the Josiah Lee Pacheco mentioned in the Petition for Writ of Habeas Corpus to which this declaration is an exhibit.

I, Josiah Lee Pacheco, declare under penalty of perjury that the following is true and correct, and if called as a witness, I could and would testify competently thereto.

1. On March 12, 2008, close to 10:00 PM, I was neither shot by Salvador Lopez nor was the shooting behind gangs. On March 12, 2008, I was shot due

to a drug deal gone bad. Minutes earlier, before the shooting, I purchased some drugs (marijuana) from a 'paisa' who sold drugs in the block. Things got carried away because of the small amount of drugs he tried to sell me. A physical altercation then took place between us and I hurt the guy badly. I did not want the police nor my parents to know what I did.

2. On March 12, 2008, I was shot by the paisa I mentioned from the earlier incident. I remember walking back home when a vehicle came to a stop and immediately two guys, including the paisa, emerged from the front and back passenger side, firing their weapons. The paisa emerged from the back passenger side and was firing from a handgun. The other suspect was firing from a long-barrel type of gun I believe to be a shotgun.

3. On March 13, 2008, when being question, I do not remember what I said regarding Mr. Lopez. But at the time, I would have said anything to avoid getting myself arrested for what occured minutes before the shooting.

4. When coming to my natural state of mind, and no longer under heavy medication or disoriented, I wanted to tell the truth—that Mr. Lopez did not shoot me, nor was the shooting behind gangs. But afraid of getting arrested for perjury, I tried to cover up my wrongdoing with gang terms by stating 'no snitching' is rule number one in the gang culture. However, I did not recant for gang purposes, as the prosecution said I was motivated to lie under oath when testifying at trial that Mr. Lopez did not shoot me. In order to save face with my gang was the theory of the prosecution, and that I did not want to ruin my street credibility and place myself in bad standing with my gang. However, that theory contradicts intself to the facts: I was a dropout gang member prior to the shooting, so that alone had already placed me in 'bad standing' with my gang. But hypothetically speaking, if I were to still be an active gang member my initial statements to Detective Clinkenbeard were sufficient to ruin my street credibility, because whether or not Mr. Lopez

Declaration of Josiah Lee Pacheco - Page 2

shot me, giving a statement to an officer is considered snitching. Groups
don't let their members repeat for a code that has already been broken. "Silence".
The truth of the matter is, my recantation was only for the purpose of coming
clean so an innocent person wouldn't get convicted, not to regain trust from
my gang that could never be regained.


        I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct, and that this declaration
was executed on    ┐·27·2015_____ at Kern Valley State Prison in the City
of Delano, California, 93216.


                                    Josiah Lee Pacheco, Declarant

IN THE COURT OF APPEALS FOR THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

SALVADOR LOPEZ,

        Defendant and Petitioner,

VS.

PEOPLE OF THE STATE OF CALIFORNIA

    <u>Real Party In Interest:</u>

MARTIN D. BITTER, WARDEN,
Department of Corrections and
       Rehabilitation
Kern Valley State Prison
Delano, California

       Plaintiff and Respondent.

Case No.:

DECLARATION OF JOSIAH LEE PACHECO,
IN SUPPORT OF PETITION FOR A WRIT
OF HABEAS CORPUS

    I, Josiah Lee Pacheco, hereby declare:

    I am an adult presently incarcerated in the California state Department of Corrections and Rehabilitation at Kern Valley State Prison, P.O. Box 5104, in the city of Delano, California, 93216. My prison identification number is AA-4932.

    I am in good health and do not suffer from any ailment that would detrimentally affect my mental capacity or ability to percieve or observe events.

    I am Josiah Lee Pacheco, mentioned in the Petition for Writ of Habeas Corpus to which this declaration is an exhibit.

    I, Josiah Lee Pacheco, declare under penalty of perjury that the following is true and correct, and, if called to witness, I could and would testify competently thereto:

    1. On March 12, 2008, after being shot, while riding in the ambulance to the hospital, I never told Officer Joshua Jackson that it was Chava Lopez

that shot me.

2. On March 13, 2008, at the first hospital visit, Detective Clinkenbeard showed me the photograph lineup while he pointed at Salvador Lopez's picture, while asking me who was Salvador Lopez in this picture, not who shot me.

3. The second hospital visit, Clinkenbeard kept showing me a photograph lineup while pointing to Salvador Lopez's picture asking me 'who shot you' while I was under heavy medication and disoriented, so much to the point where I said I thought it was Lopez who shot me, only because I had beaten up his older brother and I thought he had a problem with me but I was mistakenly wrong and Salvador Lopez never shot me.

4. Clinkenbeard convinced me to say over the telephone to Salvador Lopez, 'You shot me', even though it was not true.

5. Clinkenbeard kept pressuring me hard, with several aggressive questions like repeatedly asking me 'what happened', 'who shot you', and 'who is Salvador Lopez in this photograph lineup' while pointing to Salvador Lopez's photo. It had confused me to where I pointed at Salvador Lopez's picture, as I thought it was Salvador Lopez who shot me only for a second because I thought he had a problem with me because I had beaten up his older brother, which is the reason why I thought it was him. But I was mistaken and wrong, and Salvador Lopez never shot me.

6. I literally out spoke by displaying a fictional scenario in my head who I thought shot me, and I also thought Fidencio Mendoza and Steve Bou were involved but I was never asked or shown a photograph lineup of them as Clinkenbeard was only concerned about Salvador Lopez and neglected everything else I said because he knew that at the time I was shot, Fidencio Mendoza and Steve Bou were serving time in the county jail.

7. Salvador Lopez never shot me. This is the reason why I had gone to Salvador Lopez's preliminary hearing, to testify on behalf of Salvador

Lopez. But before the preliminary hearing, Detective Scottie Clinkenbeard took me to a room where I met with people that I still to this day do not know who they were, and they asked me several questions.

8. The main question they asked me was whether I was going to say that Salvador Lopez shot me, and I told them that I was unwilling to lie by saying Salvador Lopez shot me. However, in the end I could tell they became very upset that I wouldn't go along with them.

9. So they said that I was no help to them so I should not be at court, and was told to leave, which I did with my friend.

10. Later on, Detective Scottie Clinkenbeard called me up and started howling, pressuring me to say that Salvador Lopez shot me, but I still was unwilling to lie.

11. I'll quote Detective Scottie Clinkenbeard's words to me. Clinkenbeard said: "[J]ust say it was him, that's one scrap off the street."

12. The word 'scrap' is a disrespectful term used by Nortenos to disrespect Surenos, who are rival gang members.

13. Detective Scotie Clinkenbeard tried to act as if he was my friend so I'd lie in return by saying Salvador Lopez had shot me, but because I wouldn't lie for them, Clinkenbeard turned around and used gang terms in Salvador Lopez's trial by saying it was code to not snitch on anyone. See, Clinkenbeard did that to put it into people's heads to already think that Salvador Lopez was guilty when I went up to tell the truth by saying Salvador Lopez didn't shoot me.

14. The District Attorney also tried to say I was not going to say it was Salvador Lopez so that I could 'handle it' myself later on after trial. However, if that were true, then how come in the months of September 2010 through January 2011, when I was on the same prison yard as Salvador Lopez, I did nothing to him, nor did Salvador Lopez do anything to me?

15. I'm around Salvador Lopez every day. I work out with Salvador Lopez every day. We even play handball together and talk to each other every yard day.

16. I'm still telling the truth when I say <u>Salvador Lopez did not shoot me</u>.

17. I at first went with the District Attorney and Detective Scottie Clinkenbeard so I wouldn't get locked up, because Detective Clinkenbeard kept pressuring me into saying it was Salvador Lopez who shot me, but I could not allow myself to lie.

18. I myself believe that it is very wrong and not right to give a man, Salvador Lopez, 34 years to live for not shooting me.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on ___1\16\14___ . at Kern County State Prison in the City of Delano, CA, 93216.


Josiah Lee Pacheco, CDCR# AA-4932
Declarant

S233206

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re SALVADOR LOPEZ on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

MAY 2 5 2016

Frank A. McGuire Clerk

---
Deputy

**CANTIL-SAKAUYE**
---
*Chief Justice*